Your complimentary use period has ended. Thank you for using PDF Complete.
Click Here to upgrade to Unlimited Pages and Expanded Features

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICIA,    ) | |
| Plaintiff,    ) | |
|    ) | |
| vs.    ) | No.  08CR50004-1 |
|    ) | |
| JEFF BARTLETT,    ) | |
| Defendant.    ) | |

**SENTENCING MEMORANDUM AND FORMAL OBJECTIONS**
**TO THE PRESENTENCE INVESTIGATION REPORT**

NOW COMES the defendant, JEFF BARTLETT, by his attorneys, Stone & Associates, L. L. C., and offers this sentencing memorandum and formal objections to the pre-sentence investigation report.

**Objections to the PSI**

1.      **JEFF BARTLETT is not an organizer, manager, leader or supervisor of the criminal activity.** As such BARTLETT objects to the PSI writer's 2 point enhancement under Sec. 3B1.1 of the Sentencing Guidelines. While it is true that JEFF BARTLETT asked Thomas Jaeger to burn his brother's business, he did not manage or supervise Jaeger's selection of a third party to perform the arson. Jaeger freely selected this individual without direction from BARTLETT. To be a "leader" there must be evidence that Mr. BARTLETT controlled others. We know from Jaeger's statements to ATF agents that he, not BARTLETT, recruited the arsonist. It was Jaeger who had and used knowledge of explosives to accomplish the task. JEFF BARTLETT did not "manage" or "supervise" Jaeger in the means, mechanics, or method of this arson. Jaeger, not BARTLETT, already possessed the skill, knowledge and expertise to do so. It is clear from the ATF reports that JEFF BARTLETT did not "manage" or "supervise" the setting of the fire or the means or method of setting the fire. This was completely the work of Jaeger and his chosen accomplice. The act of showing Jaeger the location of his brother's business is insufficient to support a managerial or supervisory role in the offense. JEFF BARTLETT is not an organizer, manager, leader or supervisor.

2.      In Mr. BARTLETT's case, the recruitment of Jaeger does not give rise to the Sec. 3B1.1enhancement. See *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994), where it was held that merely recruiting others to purchase drugs does not, in and of itself, demonstrate the leadership role contemplated by Sec. 3B1.1. As in *Vargas,* where the Court stated, "supplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase," in the instant case, Mr. BARTLETT's limited contact with Jaeger does not elevate Mr. BARTLETT to the level of a leader, organizer, manager or supervisor. See also, *United States v.*

1

where the Court affirmed an enhancement under Sec. [3B1.1] for [a defenda]nt for the US Postal Service who "played both sides of the fence" in an elaborate check stealing scheme she was enlisted to help bring down. *Brown,* 900 F.2d at 1102. The Court found that Brown had numerous, repetitive and continuous involvement in the check-stealing scheme where she "**participated in the offense** and **planned the meetings**, she **instructed the sellers on what to say**, [] **arranged for all parties to be paid**. [. . and] **had near complete authority over the sale side of the criminal activity**. She **exercised authority** over the introductees, **planned** and **participated** in the exchange of stolen checks, and made possible a scheme that without her unique role as a dual agent could not be carried out." *Id.*

3. Likewise, in *United States v. Melendez*, 467 F.3d 606 (7 Cir. 2006), the Court held the enhancement under Sec. 3B1.1 was appropriate for defendant Melendez' role in a conspiracy. The evidence in that case showed that defendant **instructed** and **supervised** others, **frequently oversaw and instructed others** to break down large loads of drugs into smaller quantities, **personally tallied** the loads at the time of delivery, **ensured that he was paid for every pound** and even **approved a refund** for bad drugs. This **oversight** of and **continued involvement** in the criminal activity warranted an enhancement under Sec. 3B1.1.

4. In *United States v. Gotti*, 459 F.3d 296 (2 Cir. 2006), the Second Circuit upheld the District Court's ruling that Peter Gotti was not an organizer, leader, supervisor or manager under Sec. 3B1.1, despite being the "acting boss" of a New York crime family. *Gotti,* 459 F.3d at 348. The Second Circuit agreed with the District Court's findings that despite some evidence that Gotti "recruited . . . accomplices" for the crimes, "**the government . . . must present some evidence to show an active role in his participation**. * * * There's simply no evidence before the Court that Mr. Gotti exercised **decision-making authority** in the commission of these crimes constituting the relevant conduct, that he participated in their commission. There's nothing. In fact, the evidence shows that **he did not participate in their commission**. . ." *Gotti,* 459 F.3d at 348-49.

5. As noted by the Government in its Response to Defendant's Objection to the Presentence Report, Application Note 4 of Sec. 3B1.1 provides that the "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." The case law and the Guidelines compel a finding by this Court that a Sec. 3B1.1 enhancement is not applicable in the instant case.

6. The probation officer's reliance on the defendant's alleged statement to Jaeger that he (BARTLETT) told his mother that he could not have burned down his brother's business because he was at a family bar-b-que (a statement that the probation officer characterizes as an attempt alibi) is misplaced. This reference is made at page 4, lines 130 to 134 of the PSI. There is no evidence that such a conversation ever occurred. The government is required to prove disputed facts in order to sustain their burden if the Court is to allow this enhancement. *United States v. Milton,* 153 F.3d 891 (8th Cir. 1998). Even more importantly, this purported statement

JEFF BARTLETT organized, lead, supervised or managed ... statement to his mother neither proves nor demonstrates a leadership role in the offense.

7.  Further, the suggestion that JEFF BARTLETT had "previously told him (Jaeger) to drive north on Alpine Road to Riverside and that would take him (Jaeger) back to the interstate" (page 4, lines 128, 129) does not demonstrate a managerial role in the offense.  Jaeger was free to choose his own accomplice (and in fact, did so without informing BARTLETT).  Jaeger was free to choose the means and method of the arson.  He was free to choose his own transportation and route to and from the arson scene. The Jaeger version of the events found at page 4 of the PSI is disputed.  See Jaeger's version of the "bar-b-que alibi" above and his different version of the Canadian fishing trip "alibi" in the government's response to our objections filed July 16, 2008.

8.  More, the defense believes that Jaeger has misled law enforcement authorities as to the identity of his accomplice.  Jaeger claims to have been assisted in the arson by Joe Plezbert.  Conveniently for Jaeger, Plezbert is dead.  JEFF BARTLETT met with Jaeger and Kenneth Warhack, a close friend of Jaeger, at Jaeger's mother's home after the fire, where he paid Jaeger and Warhack for the job.  Plezbert played no role in the offense and was not named by Jaeger until after his death.  The defense believes that Jaeger has falsely named Plezbert to protect Warhack.

9.  The government bears a burden of proof on such disputed facts.  While JEFF BARTLETT accepts responsibility for his conduct, that acceptance does not give the government or the probation officer a blank check to enhance, by 2 points, JEFF's role in this offense.  The *Golden* case relied upon by the government is inapposite.  Preliminarily, it is worth noting that the relevant issue in *Golden* was whether co-defendants can both qualify as organizers within the meaning of Sec. 3B1.1(c) – a different issue than that which is currently before this Court. *United States v. Golden*, 954 F.2d 1413, 1419 (7th Cir. 1992).

10.  The facts in *Golden* actually compel a finding that Mr. BARTLETT was <u>not</u> an organizer, leader, supervisor or manager.  In *Golden*, the defendant had an active role in the criminal activity and participated in its commission; Golden's contacts with the crime were continuous and controlling.  In that case, Golden was hired to set a fire and he obtained help from another man, "Tennessee." *Golden,* 954 F.2d at 1415.  Golden and Tennessee physically climbed to the roof of the target building, poured gasoline down the vent, and Tennessee dropped matches down the vent.  *Id*.  After confirming that the fire had started, Golden and Tennessee fled.  *Id*.  When that fire did not cause as much damage as desired, Golden returned about a week later to the same building, with Tennessee and an additional man he had contacted.  *Id*.  The additional man was directed to be a look out, and Golden again went to the roof of the building and helped Tennessee pour gasoline.  *Id*.  Golden also prepared several "Molotov cocktails" which they ignited and threw into the building.  *Id*.  The Seventh Circuit held that: "Golden played an integral role as an organizer during both arsons. In the [first] fire, Golden recruited the assistance of Tennessee. When that fire was unsuccessful, Golden organized a second attempt, this time with the help of both Tennessee and Walker. Following both fires, Golden received payment from McCorker [the person who hired Golden], and in turn Golden distributed a small

s. . .This evidence clearly supports the district court's
 . . .nizer." *Golden,* 954 F.2d at 1419.

11. **JEFF BARTLETT is entitled to a 3 point deduction for acceptance of responsibility under Sec. 3E1.1 of the Sentencing Guidelines.** Mr. BARTLETT is entitled to a three point deduction for acceptance of responsibility. Following the indictment in this cause, JEFF BARTLETT, nearly immediately, contacted the prosecution through his attorney and plead guilty. This act of immediate acknowledgement of culpability is a clear statement of acceptance of responsibility. Moreover, the government acknowledged Mr. BARTLETT's acceptance of responsibility in the plea agreement: "Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct." In the PSI, the probation officer noted that Mr. BARTLETT told her in clear and unambiguous language, "I am responsible for my own actions. I take responsibility; it's my fault. Nobody made me do it…. I take responsibility for hiring someone to burn down by brother's business." Page 5, lines 163 to 172. Additionally the government has moved, pursuant to our bargained-for agreement, to reduce this offense an additional level because of Mr. BARTLETT's timely notifying the government of his intention to plead guilty, thereby permitting the government to avoid preparing for trial and to allocate its resources efficiently. The government concurs with our position in its recent submission to the court. JEFF BARTLETT is entitled to a 3 point deduction for acceptance of responsibility. On a final note for acceptance points, Mr. BARTLETT is preparing a certified check, payable to Cincinnati Insurance in the sum of fifteen thousand dollars ($15,000.00) payable towards restitution.

12. **Where the Guidelines' calculations tend to over-punish an offender, the Court should consider downward departures from those guidelines.** In the instant case, the Guidelines do not adequately take into account the unique circumstances of this case described below. U.S.S.G., Sec. 5K2.0(a)(3). Here, Congress mandated that all persons convicted of 18 U.S.C. 844(i) be sentenced to a minimum of 60 months in custody of the Bureau of Prisons. When JEFF BARTLETT entered his plea of guilty both he and the government believed that the sentence of this court would be 60 months. If the court accepts the above objections, the new total offense level will be 23. If the Criminal History is a Category III as contemplated by the government and Mr. BARTLETT, the guideline range falls around the contemplated 60 months. If United States Probation Officer Taborski's calculations for criminal history are accepted, the range exceeds the contemplated 60 months and falls between 70 and 87 months. Such a calculation works an injustice.

13. A careful analysis of BARTLETT's criminal background shows that the accumulated history points primarily fall around domestic and traffic issues. Specifically, the older arrests include: a domestic incident with a girlfriend when Mr. BARTLETT was 25-years-old (in 1990, over eighteen years ago) and both parties were intoxicated; another domestic incident with an ex-girlfriend in 1993 when Mr. BARTLETT was 28-years-old; and a DUI in 1995 for which Mr. BARTLETT received supervision and should thus not be part of the criminal history calculation. The more recent arrests include: criminal damage to property in 2002, where JEFF's brother Mark was the complainant; domestic battery in 2002 where JEFF's brother John was the complainant; and an arrest for driving with a revoked license in 2003 (for which the PSI

4

PDF Complete. Your complimentary use period has ended. Thank you for using PDF Complete. Click Here to upgrade to Unlimited Pages and Expanded Features

she retracted in the "Supplemental Report," dated July 9,

14. Much of the criminal activity included in the PSI is decades old. This cause is unusual in that the instant crime was committed on July 22, 2000 but not indicted until March 2008. The Sentencing Guidelines permit the probation officer to accumulate criminal history points back-dating 15 years from the date the offense was committed, if sentenced to 13 months or longer (or 10 years for other sentences), not the date that court action or prosecution began. U.S.S.G. Sec. 4A1.2. This permits the court to observe a pattern of activity long-ago abandoned by JEFF BARTLETT. The defense is not arguing that JEFF should be given accolades for his past. To the contrary, JEFF's conduct was blameworthy. But the unusual gap between the offense and the prosecution appear to allow the probation officer to include history points beyond those necessary and just to understand the range of punishment under the law.

15. Of course the Guidelines are not mandatory. They exist only to assist the court in arriving at a lawful sentence under 18 U.S.C. 3553. The Congressional mandate is that the sentence imposed in this cause be "sufficient but not greater than necessary." A sentence of 60 months is sufficient. It is the sentence contemplated by the parties at the time of the plea agreement.

16. JEFF BARTLETT immediately admitted his conduct and promptly pled guilty. He and the government agreed to a plea and signed a plea agreement expecting that this court would sentence BARTLETT to 60 months imprisonment. The court is urged that the agreement was just and fair; that the sentence of 60 months was appropriate; that the criminal history points assessed are excessive; and that the reasonable sentence is the one sought by BARTLETT in his plea agreement.

**Sentencing Memorandum**

What sentence will meet Congress' intent to properly punish JEFF BARTLETT? We begin, of course, with the mandate that the court impose a minimum five year term. What about this offense or the offender requires the court to exceed this minimum sentence? At first blush the many minor run-ins with the law raise a level of concern. The first offense for which criminal history points can be assessed is found on page 14, line 400 of the PSI is a misdemeanor battery for which he received a conditional discharge from the Circuit Court of Cook County. The offense occurred in May 1990, more than eighteen years ago. The next history points were assessed on a felony battery charge from August 1991. Those relevant facts are found on page 15, lines 422 through 435 of the PSI. The remaining criminal history points found between pages 15 and 20 of the PSI catalogue a series of relatively minor infractions that add up to an overstated criminal history. It is important to note that JEFF and his wife, Kelly, started a family in the early 2000s. They have two children, Haley and Hannah. The instant offense occurred on July 22, 2000. Eight years ago.

JEFF BARTLETT has changed his life over the course of those eight years. One only needs to look at the many letters written by the people who know him best to assess that JEFF has changed his life for the better.

on the extraordinarily difficult life JEFF BARTLETT had as a child. He is estranged from his mother. He was at war with his sibling. Nevertheless, Kelly told the Court in her letter of July 7, 2008, "He (JEFF) has changed so much in the last two years, its been amazing. We found wonderful friends who except [sic] us for who we are not what they want us to be. We have started going to church and now Jeffrey knows that there can be forgiveness for everything." This lesson of forgiveness has released JEFF from his life-long struggle against his family, Mark in particular.

JEFF BARTLETT is a good father to Haley and Hannah. While his separation from the family is required by the law, mercy and concern for his family should mitigate the time he must spend away from those who love and need him.

In a letter dated July 3, 2008, a family friend, Padraic O'Neil, wrote to the court, "His (JEFF's) growth, personally and spiritually, is tremendous-he really accepts responsibility for his actions, realizing it was his poor decision making and anger that put him where he is. He is even recognizing that God is at work in changing his character through being in jail… I ask you to consider the deep changes demonstrated by Jeff in his private conversations and meetings with me when deciding his sentence." People who really know JEFF see a change in him that defies the cold printed word on the court's pre-sentence investigation report.

JEFF's mother-in-law assesses JEFF this way: "This past year he (JEFF) was going to church, reading the Bible and trying to be with the right people. He was doing things fathers do with their children, doing things as a family. He really was trying to find a way to talk with his family to make amends, he wanted a relationship with them." Mrs. Gabardi concludes, "Jeff has changed in so many ways and I pray he gets the chance to prove himself."

Members of his church, Jan and Craig Klass, observed, "Over the past two years we have seen a significant change in Jeff's life… He slowly began to understand Christian theology and eventually accepted the teachings as truth and relevant for his own life… He has come a long way in improving his behavior and respect for authority… He realizes that there would eventually be consequences for his past behavior… We truly believe Jeff regrets his actions and will not return to a life of crime once he is released from prison." Letter, June 8, 2008.

In other words, JEFF BARTLETT is attempting to redeem himself before his God and with this Court. This Court believes in the power of rehabilitation and the greater power of redemption. JEFF is one of those souls willing to be turned around, seeking the opportunity to be a good citizen.

It is clear from all of his actions since his indictment on these charges that JEFF BARTLETT accepts responsibility for his criminal conduct. It is clear from his actions that he aches to return to his family, love his wife and rear his children. It is clear from the man JEFF BARTLETT has become that the Court need not consider more than the Congressionally-mandated 60 month sentence to meet the ends of justice.

...ed us that "Justice is the law tempered by mercy." While ...urge the court to exceed the minimum term required, JEFF BARTLETT, his wife and children and those who know and love him, urge this court temper its sentence with mercy.

While JEFF finds great solace in his belief in Jesus and the New Testament, defense counsel looks to his own tradition for guidance and comfort. There, in the "Book of Micah", the lesser prophet asks, "What does the Lord require of us?" He answers, "Only to do justice, love mercy and walk humbly with God."

Because the core of JEFF's criminal history is over a dozen years old, because he accepts responsibility for his conduct, because of his family and their love and need for him, because of his transformation as a man, because mercy and justice cry out for it, JEFF BARTLETT seeks a sentence of 60 months.

            Respectfully submitted,

            _____s/ Jed  Stone_____
            One of the attorneys for JEFF BARTLETT

Jed Stone
Stone & Associates, L. L. C.
415 West Washington Street
Suite 107
Waukegan, Illinois 60085
847 336 7888

## CERTIFICATE OF FILING AND SERVICE

I, JED STONE, certify that on July 18, 2008, I caused the foregoing pleading (1) to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Western Division; and (2) a copy thereof to be mailed to:

> Mark T. Karner
> Assistant United States Attorney
> 308 West State Street ó Room 300
> Rockford, Illinois 61101

                                        _____s/ Jed Stone_____
                                        One of the attorneys for JEFF BARTLETT

PDF Complete. Your complimentary use period has ended. Thank you for using PDF Complete. Click Here to upgrade to Unlimited Pages and Expanded Features